IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>TRAVIS FRITZSCHING,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**<br><br>Case No. 2:15-cr-00715<br><br>District Judge David Nuffer |

This matter is before the court on Defendant Travis Fritzsching's motion to suppress.[1] On November 7, 2016, an evidentiary hearing was held on the motion. After reviewing the case law and arguments submitted by the parties,[2] the motion to suppress is DENIED.

**FINDINGS OF FACT**

1.      Sometime before November 23rd, 2015, a Texas investigation revealed that emails had been received from a 522x2wins@gmail.com account, and indicated that child pornography may have been exchanged, as well as that there may have been a minor being sexually abused.[3]

2.      An investigation commenced into the 522x2wins@gmail.com account, in which Special Agent Jeffrey Ross, of the FBI's Salt Lake City office, participated.[4] Agent Ross reviewed driver's license records, which showed that photographs associated with the emails

---

[1] Motion to Suppress Evidence (Motion), docket no. 29, filed September 30, 2016.

[2] United States' Proposed Order, docket no. 43, filed December 9, 2016; Defendant's Proposed Order, docket no. 44, filed December 23, 2016.

[3] Evidentiary Hearing Transcript (Tr.) at 7, 11, docket no. 39, filed November 15, 2016.

[4] Tr. at 7–8.

were similar to the driver's license photograph of Mr. Travis Fritzsching ("Mr. Fritzsching"), the defendant.[5] The name associated with the 522x2wins@gmail.com account was "Otay Otay."[6]

3.      Before joining the FBI in 1999, Agent Ross worked for five-and-a-half years at a residential center for troubled children.  He also worked for one-and-a-half years at a camp for mentally retarded adults and worked for some time at a private for-profit mental hospital.[7] Agent Ross worked for approximately eight years in the mental health field.[8]

4.      Before joining the FBI in 1999, Agent Ross took classes related to mental retardation, developmental disabilities, and abnormal psychology at Ohio State University where he obtained a degree in psychology and criminology.[9]

5.      Agent Ross also obtained criminal history and warrant records regarding Mr. Fritzsching, which indicated that Mr. Fritzsching had previously had several encounters with law enforcement that were somewhat hostile and aggressive.[10] In one such incident, Mr. Fritzsching had displayed suicidal behavior, and Mr. Fritzsching was tased by police officers and involuntarily committed to a hospital for treatment.[11]

6.      The agents and officers investigating the 522x2wins@gmail.com account were in possession of all such background information about Mr. Fritzsching before they procured a warrant to search for child pornography in his residence.[12]

---

[5] Tr. at 15, 25, 109-10, 112-13.

[6] Tr. at 16–17.

[7] Tr. at 6:20-25.

[8] Tr. at 7:5.

[9] Tr. at 23:11-16.

[10] Tr. at 15:12-15, 24–25, 27.

[11] Tr. at 15, 25:11-17.

[12] Tr. at 26.

7.      The agents and officers procured a search warrant and served that warrant on November 23, 2015 at Mr. Fritzsching's residence, his parents' home in Riverton, Utah.[13] The officers executed the search warrant early in the morning, roughly between 7:00 and 8:00 a.m.[14]

8.      On the morning of November 23, 2015, before executing the search warrant, officers observed Mr. Thomas Fritzsching, the defendant's father leaving the home.[15] Officers stopped the father shortly after he left the home and directed him to the nearby Riverton Library parking lot,[16] which the officers were using as a staging ground for the search.[17]

9.      At the parking lot, the agents informed the father that they had a search warrant to investigate child pornography they believed Mr. Fritzsching possessed on electronic devices in the Fritzsching home.[18] The agents showed the warrant to the father.[19] The agents also informed the father that they were aware of Mr. Fritzsching's prior encounters with law enforcement officers.[20]

10.     During this discussion, the father indicated that Mr. Fritzsching was likely to be agitated by the search,[21] as well as that Mr. Fritzsching suffered from depression, anxiety, and had a history of suicidal tendencies.[22] The father stated that Mr. Fritzsching was currently taking prescription medication for his mental health issues,[23] and that at that time of morning, Mr.

---

[13] Tr. at 7-8, 71-72, 81.

[14] Tr. at 45.

[15] Tr. at 8:7-8.

[16] Tr. at 74:6.

[17] Tr. at 8:5.

[18] Tr. at 8, 73–74, 77–78.

[19] Tr. at 30:11-16.

[20] Tr. at 8:12-19.

[21] Tr. at 78:3-5.

[22] Tr. at 8, 28, 74–75.

[23] Tr. at 28-29.

Fritzsching was likely still asleep in the basement of the home.[24] The father did not tell the

agents that Mr. Fritzsching exhibited, or had ever exhibited, characteristics of borderline mental

retardation.[25] At the hearing, Agent Ross testified that the father might have told him that Mr.

Fritzsching was taking anti-anxiety medications.[26]

      11.     The entire conversation with the father lasted roughly five minutes.[27] Based on

the father's statements, the officers decided to "scale back" the search warrant execution from

normal procedure,[28] and the father voluntarily admitted the officers into the Fritzsching home to

execute the warrant.[29]

      12.     A small group of roughly five agents/officers entered the home and went into the

basement, where they found Mr. Fritzsching.[30] The officers woke Mr. Fritzsching, handcuffed

him, and took him outside to the interview room in the back of a mobile forensics lab (a

specially-equipped box truck).[31]

      13.     At some point during the operation, one officer spoke with Mrs. Virginia

Fritzsching, the defendant's mother, about Mr. Fritzsching's depression, medication, and sleep

apnea.[32] The mother expressed concerns about Mr. Fritzsching being able to bring his CPAP

machine (for sleep apnea) or his medications if taken into custody.[33]

---

[24] Tr. at 8, 29:9-12.

[25] Tr. at 28:16-22, 30:6-8.

[26] Tr. at 29:20-21.

[27] Tr. at 30:11.

[28] Tr. at 8–10.

[29] Tr. at 9:1-14, 78:10-16.

[30] Tr. at 9:18-22.

[31] Tr. at 9:18-22.

[32] Tr. at 92:2-11.

[33] Tr. at 92:12-13.

14.     Mr. Fritzsching's father testified at the hearing that Mr. Fritzsching has problems with comprehension and understands things differently than other people would be expected to understand them.  He also testified that when Mr. Fritzsching does not want to deal with things he will, at times, say that he understands when, in fact, he does not.[34]

15.     Mrs. Fritzsching testified at the hearing that Mr. Fritzsching, her son, has suffered severe anxiety and depression issues since he was as young as eight years old.  She also testified that Mr. Fritzsching was diagnosed at a young age with borderline mental retardation.[35]

16.     Mr. Fritzsching was interviewed in the back of the mobile forensics lab,[36] in an interview room measuring roughly eight feet by twelve feet, and containing two benches and a table.[37] Agent Ross and Agent James May, a detective with the Tooele Police Department,[38] were both present during the interview, which Agent Ross alone conducted.[39] Agent Ross could not recall whether the two agents' firearms were visible during the interview, but believed that at least his own firearm was not visible.[40]

17.     Agent Ross is trained to interrogate suspects.  He is trained in the use of investigatory tactics such as the use of deception, intimidation, and instilling fear.  He testified that he did not use these tactics in this case.[41]

18.     Agent Ross could not remember certain details of the interview including times where he may have conducted the interview using leading questions.[42]

---

[34] Tr. at 76:7-22.

[35] Tr. at 81:25- 82:13.

[36] Tr. at 10.

[37] Tr. at 37–38.

[38] Tr. at 46:1-3, 53–54.

[39] Tr. at 46, 55:21-23.

[40] Tr. at 38–39.

[41] Tr. at 39:21-40:6.

19.     Before the interview began, Agent Alan Conner, an investigator with the Utah Attorney General's office, set up the interview recording equipment in the mobile forensics lab.[43] Agent Ross did not begin the interview until Agent Conner communicated that the equipment was recording.[44]

20.     The interview lasted between one and one-and-a-half hours.[45] Agent Ross began the interview by stating that the officers were at Mr. Fritzsching's residence to investigate suspicious email use.[46] At this point, before Agent Ross began asking questions,[47] Mr. Fritzsching stated that the email account belonged to him.[48] Mr. Fritzsching stated that he hadn't actually molested any children,[49] but rather had just talked about doing so.[50] Agent Ross told Mr. Fritzsching to stop talking,[51] so that Agent Ross could give him more details about the purposes of the investigation.[52]

21.     Agent Ross told Mr. Fritzsching that the investigation had three purposes: first, to remove all child pornography from the Fritzsching home; second, to identify any children still subject to sexual abuse; and third, to determine if Mr. Fritzsching was still communicating with others about child sexual abuse or child pornography.[53]

---

[42] Tr. at 41:16-42:8.

[43] Tr. at 62–63.

[44] Tr. at 10:23-24, 18, 63:15-19.

[45] Tr. at 39:3-4.

[46] Tr. at 10-11.

[47] Tr. at 41:3-4.

[48] Tr. at 39, 41.

[49] Tr. at 41:8-9.

[50] Tr. at 11:6-8.

[51] Tr. at 11:9, 41, 57–58.

[52] Tr. at 11, 14.

[53] Tr. at 11:11-21.

22.     Agent Ross then produced a small, credit card-sized card, from which he read a statement regarding Mr. Fritzsching's *Miranda* rights.[54] After Agent Ross finished reading the card, Mr. Fritzsching agreed to continue the interview.[55]

23.     Upon questioning, Mr. Fritzsching proceeded to tell Agent Ross about the 522x2wins@gmail.com account, which Mr. Fritzsching stated he himself had created.[56] Mr. Fritzsching stated that the account name was related to pigeon racing, his personal hobby.[57] Mr. Fritzsching stated he had used the 522x2wins@gmail.com account to falsely tell others that he had been sexually abusing a child, but in reality he did not have sexual access to any children.[58] He also stated that he had used Craigslist for between four and five years in order to exchange child pornography with others.[59] Mr. Fritzsching stated that he had closed the 522x2wins@gmail.com account because he had become uncomfortable with others' inquiries about Mr. Fritzsching's claimed sexual access to children.[60]

24.     Mr. Fritzsching told Agent Ross that after closing the 522x2wins@gmail.com account, he began using another account, with the address hipwithswag@gmail.com.[61] Mr. Fritzsching stated that, using that account, he had made contact (through Craigslist) with a young male who claimed to be eighteen years old, but who later represented that he was sixteen years

---

[54] Tr. at 11–13, 58; s*ee also* Ex. 1 (photograph of Agent Ross's *Miranda* card).

[55] Tr. at 13:18-20.

[56] Tr. at 15:19-20.

[57] Tr. at 15:20-22, 55:13-17.

[58] Tr. at 16:4-5, 49–50.

[59] Tr. at 16:6-7, 111:2-4.

[60] Tr. at 16–17, 50:1-8.

[61] Tr. at 16:8-9.

old.[62] Mr. Fritzsching stated that he had received sexually explicit photographs from the young male, but had later deleted the photographs.[63]

25.     Mr. Fritzsching told Agent Ross that he stopped using the account 522x2wins@gmail.com because people continued to contact him about sexually molesting children.[64]

26.     Agent Ross did not know if Mr. Fritzsching could remember the specific interactions with the individual who was the subject of the related investigation in Texas.  Mr. Fritzsching told Agent Ross that he had communicated with multiple individuals about having molested children.  Mr. Fritzsching did not remember a specific screen name.[65]

27.     Mr. Fritzsching stated that he had also found sexual material online through Internet searches for the term "RU boys."[66] However, Mr. Fritzsching repeated that he had never actually had sexual contact with a child,[67] and that his only actual sexual contact in his life had been with an adult, several years earlier.[68]

28.     Mr. Fritzsching told Agent Ross that he no longer had access to the now-closed 522x2wins@gmail.com account.[69] However, he did provide the correct password to his

---

[62] Tr. at 16:11-12.

[63] Tr. at 16:13-14.

[64] Tr. at 17:15-18.

[65] Tr. at 49:20-25, 50:1-8.

[66] Tr. at 16:16-17, 114:7-9.

[67] Tr. at 47–48.

[68] Tr. at 48:7-10.

[69] Tr. at 16:7-9.

hipwithswag@gmail.com account.[70] Agents thereafter searched the hipwithswag@gmail.com account[71] and found no child pornography.[72]

29.     During the interview, Mr. Fritzsching did not appear agitated.[73] He was able to articulate answers to questions.[74] He was not looking around anxiously.[75] He nodded in response to statements in conversation,[76] was alert throughout,[77] and spoke with a quiet and subdued tone.[78] Agent Ross believed Mr. Fritzsching was calm, because Mr. Fritzsching was not shaking.[79] Mr. Fritzsching did not cry or sob at any time during the interview,[80] but may have been a little tearful.[81] However, any such emotional response did not interfere with the interview.[82] Mr. Fritzsching did not joke with the agents,[83] and appeared aware of what was occurring.[84] Mr. Fritzsching was sitting, leaning forward, with his hands together, throughout the interview.[85]

---

[70] Tr. at 17:24, 20:19-20, 114:8-11.

[71] Tr. at 17:22-25.

[72] Tr. at 18:1-2, 114:10-12.

[73] Tr. at 30131, 37:17, 54.

[74] *See, e.g., id.* at 47–48, 50:9-16, 54.

[75] Tr. at 36:10-11.

[76] Tr. at 34:17-20.

[77] Tr. at 49:12-13, 54:19-20.

[78] Tr. at 35:1-2, 37:18.

[79] Tr. at 35:2.

[80] Tr. at 36:2-3.

[81] Tr. at 36–37.

[82] Tr. at 37:8.

[83] Tr. at 33:4-6, 36–37.

[84] Tr. at 13–14, 21, 33, 50, 54–55.

[85] Tr. at 34:9-13.

30.     Agent Ross observed no indications that Mr. Fritzsching did not understand his questions,[86] and Mr. Fritzsching's answers were appropriately responsive to the questions.[87] Agent Ross noted that when he initially explained what had led the agents to Mr. Fritzsching's residence, Mr. Fritzsching stated (without being prompted by a question from Agent Ross) that he had sent messages discussing child sexual abuse, but had never actually sexually abused a child.[88] At no time during the interview did Mr. Fritzsching ask for clarification or state that he didn't understand Agent Ross's questions.[89]

31.     During the interview, Agent Ross asked if Mr. Fritzsching was suicidal, to which Mr. Fritzsching responded, "Who wouldn't be?"[90] Besides this statement, neither Agent Ross nor Agent May observed any other indications that caused them concern about Mr. Fritzsching's ability to participate in the interview.[91] Mr. Fritzsching seemed oriented as to who he was, who Agent Ross was, and what the agents were doing.[92] Mr. Fritzsching related his personal information without error or unnecessary hesitation.[93]

32.     The DVDs on which the agents generally record interviews[94] have a capacity to record roughly one hour of interview on each disk.[95] During the course of the interview, Agent Conner indicated to Agent Ross that, in order to continue recording the interview, Agent Conner

---

[86] Tr. at 20:6-8.

[87] Tr. at 13-14, 20-21, 54.

[88] Tr. at 20–21.

[89] Tr. at 21:3-7.

[90] Tr. at 21:9-10, 32:11-12.

[91] Tr. at 46:18-20, 48, 56:1-3.

[92] Tr. at 13–14, 33, 49–50, 55–56.

[93] Tr. at 20–21.

[94] Tr. at 18, 39.

[95] Tr. at 39, 64.

would need to insert a new DVD.[96] Agent Conner inserted a new DVD, and the interview

continued.[97]

33.     At the end of the interview, Agent Conner gave Agent Ross two DVDs,[98] with the

belief that the disks contained the interview recording.[99] Agent Ross placed the disks in his case

file.[100] The disks were not treated as evidence to be held in a chain-of-custody bag.[101] At some

point later, Agent Ross attempted to play the DVDs in his FBI office and discovered that nothing

had been recorded onto the disks; rather, the DVDs displayed only "white snow."[102]

34.     Upon discovering the DVD issue, Agent Ross called Agent Conner and informed

Agent Conner that the DVDs didn't work.[103] Agent Conner told Agent Ross that the DVDs

perhaps had not been properly "finalized."[104] Agent Ross removed the DVDs from his case file

and proceeded to the AG's Office.[105] After further investigation, officers concluded that the

problem was unrelated to the DVDs' "finalization," but, rather, the interview had not been

recorded at all.[106]

35.     During the search, agents seized four telephones from the Fritzsching residence.

At least one phone was seized from Mr. Fritzsching's basement bedroom.[107] One of the phones

---

[96] Tr. at 18, 39.

[97] Tr. at 64.

[98] Tr. at 42:23-25, 69; s*ee also* Ex.'s 2 and 3 (copies of the disks).

[99] Tr. at 66-67.

[100] Tr. at 19:18-19.

[101] Tr. at 42–44, 46–47.

[102] Tr. at 18:18-22, 47.

[103] Tr. at 18:23-25, 65:3-4.

[104] Tr. at 18–19, 69–70.

[105] Tr. at 18–19.

[106] Tr. at 18, 40, 64, 69–70.

[107] Tr. at 95-96, 105, 113.

seized was a Blackberry which did contain child pornography, but the mother indicated that she had possession of the Blackberry for several years prior to the seizure.[108] Agent Ross could not recall which phone Mr. Fritzsching was actively using at the time the warrant was executed.[109]

**ANALYSIS**

Mr. Fritzsching moves to "suppress statements he made during or following the execution of [the] search warrant . . . on or about November 23, 2015," as well as "any officer testimony concerning these statements."[110] Mr. Fritzsching claims that his *Miranda* waiver was invalid because the "officers knew . . . that he had a prior history of mental illness and a markedly diminished social and mental capacity."[111] In the alternative, Mr. Fritzsching also urges that "the destruction of the recording of the interview, or officer action rendering it otherwise unavailable to the defense, constitutes a violation of [Mr. Fritzsching's] right to Due Process."[112] The evidence does not support either argument.

**I.   Mr. Fritzsching's *Miranda* waiver was valid.**

Mr. Fritzsching claims that the agents "knew, before they arrested [him] or sought to procure a waiver of his *Miranda* rights, that he had a prior history of mental illness and a markedly diminished social and mental capacity."[113] On that basis, Mr. Fritzsching argues that his *Miranda* waiver was ineffectual, and that therefore his statements at the interview should be suppressed. Mr. Fritzsching further argues that, regardless of how he appeared to Agents Ross

---

[108] Tr. at 90-92, 113.

[109] Tr. at 113:13-20.

[110] Motion at 2.

[111] *Id.*

[112] *Id.* at 3.

[113] *Id.* at 2.

and May during the interview, his mental capacity is such that the waiver could not be knowing under *Miranda*.[114]

For a defendant's *Miranda* waiver to be valid, that waiver must be "made voluntarily, knowingly and intelligently."[115] This standard incorporates two distinct requirements: first, the waiver must be made voluntarily; and

> [s]econd, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.[116]

Mr. Fritzsching does not attack the voluntariness of his *Miranda* waiver, and therefore only his challenge to the knowing and intelligent nature of the waiver will be analyzed.

"'In determining whether a waiver of rights was knowing and intelligent, [courts] employ a totality of the circumstances approach.'"[117] When a defendant seeks suppression based on an allegedly invalid *Miranda* waiver, the government bears the burden of proving, by preponderance of the evidence, that the waiver was knowing and intelligent.[118]

The agents' awareness of Mr. Fritzsching's past mental and emotional disturbances is not grounds for suppression. That awareness constitutes only one portion of the totality of the circumstances analysis. The central question in the analysis of a knowing and intelligent waiver is how Mr. Fritzsching appeared and acted during the interview itself.[119] In *United States v.*

---

[114] *Id.* at 3.

[115] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[116] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

[117] *United States v. Augustine*, 742 F.3d 1258, 1265 (10th Cir. 2014) (quoting *United States v. Burson*, 531 F.3d 1254, 1256-57 (10th Cir. 2008)).

[118] *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

[119] *See, e.g., United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002).

*Morris*,[120] federal agents shot Mr. Morris during the arrest, and Mr. Morris "remained in intensive care for seven days" afterward.[121] Agents thereafter "secured a signed *Miranda* waiver from Mr. Morris and interviewed him" while Mr. Morris was still in the hospital.[122] Before trial, Mr. Morris moved to suppress the statements he made during the hospital interview, claiming that his waiver was not knowing or voluntary, due to the effects of "pain, . . . pain medications, and the post-traumatic stress of being shot."[123] The Tenth Circuit affirmed the denial of the motion to suppress, emphasizing Mr. Morris's behavior during the interview: he "signed the waiver, was promised nothing, was alert and responsive during the interview, and demonstrated that he understood his right to remain silent by refusing to provide a written statement following the interview."[124]

In *United States v. Curtis*,[125] The Tenth Circuit again emphasized the importance of a defendant's appearance and conduct during the interview itself. In that case, Mr. Curtis moved to suppress his videotaped confession to detectives, claiming that "when he gave it, he was under the influence of marijuana, crack cocaine and alcohol he had consumed earlier that day."[126] The Tenth Circuit affirmed the trial court's denial of the suppression motion, emphasizing that neither the police officer nor the trial court (after reviewing the videotaped interview) could see any "obvious problem [from] the drug use."[127] According to the arresting officer, Mr. Curtis "appeared lucid throughout [the interview.] 'He did not appear to be under the influence of any

---

[120] 287 F.3d 985 (10th Cir 2002).

[121] *Morris*, 287 F.3d at 987.

[122] *Id*.

[123] *Id*. at 989.

[124] *Id*.

[125] 344 F.3d 1057 (10th Cir. 2003).

[126] *Curtis*, 344 F.3d at 1065.

[127] *Id*.

intoxicant. He was very calm and cool and was able to answer questions.'"[128] Similarly, the interrogating officer stated that Mr. Curtis "'was able to conduct a concise conversation, answer questions completely when put to him. . . . [H]e was not stumbling, his speech was not slurred.'"[129]

Here, Agents Ross and May testified that Mr. Fritzsching did not appear agitated during the interview.[130] Rather, he articulated coherent answers to questions,[131] nodded in response to statements in conversation,[132] was alert throughout,[133] and spoke in a quiet and subdued manner appropriate for the gravity of the situation.[134] Mr. Fritzsching did not joke around with the agents,[135] and appeared aware of what was occurring.[136] Furthermore, at no time during the interview did Mr. Fritzsching ask for clarification or state that he didn't understand Agent Ross's questions.[137] Aside from Mr. Fritzsching's vague indication of suicidal thoughts, neither Agent Ross nor Agent May observed any indications that caused them concern about Mr. Fritzsching's ability to participate in the interview.[138] Mr. Fritzsching related his personal information without error or unnecessary hesitation.[139] Mr. Fritzsching's conduct and demeanor gave Agents Ross and May no reason to believe that the *Miranda* waiver was not knowing or voluntary.

---

[128] *Id.* at 1066.

[129] *Id.*

[130] Tr. at 30-31, 37, 54.

[131] Tr. at 47–48, 50, 54.

[132] Tr. at 34.

[133] Tr. at 49, 54.

[134] Tr. at 35, 37.

[135] Tr. at 33, 36–37.

[136] Tr. at 13–14, 21, 33, 50, 54–55.

[137] Tr. at 21.

[138] Tr. at 46, 48, 56.

[139] Tr. at 20–21.

Although the waiver analysis must focus on how Mr. Fritzsching appeared and acted during his interview with Agents Ross and May,[140] Mr. Fritzsching argues that permanent intellectual disability or diminished capacity prevented him from knowingly and intelligently waiving his *Miranda* rights.[141] This argument is unpersuasive. Other than his mother's testimony that before Mr. Fritzsching was school age, a test result indicated "borderline retardation,"[142] Mr. Fritzsching produced no admissible evidence of permanent intellectual disability or diminished capacity at the evidentiary hearing. Had Mr. Fritzsching actually produced evidence of mental disability, that evidence alone would not invalidate his *Miranda* waiver. Rather, that evidence would only help "to determine in a close case that the police should have known that [Mr. Fritzsching] could not understand."[143] This is not a close case. Both agents in the interview room testified that, besides Mr. Fritzsching's vague comment regarding suicidal thoughts, they did not observe any other indications which caused them concern about Mr. Fritzsching's ability to participate in the interview.[144] Rather, Mr. Fritzsching articulated coherent answers to questions,[145] nodded in response to statements in conversation,[146] was alert throughout,[147] and appeared aware of the circumstances of the interview.[148]

---

[140] *See Morris*, 287 F.3d at 987–89*; Curtis*, 344 F.3d at 1065–66.

[141] Motion at 2 ("Defendant further argues that he did not, in fact, understand the rights as they were read to him due to his actual mental ability.").

[142] Tr. at 82:5-11.

[143] *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc).

[144] Tr. at 46, 48, 56.

[145] Tr. at 47–48, 50, 54.

[146] Tr. at 34.

[147] Tr. at 49, 54.

[148] Tr. at 13–14, 33, 49–50, 55–56.

Therefore, based on the totality of the circumstances surrounding Mr. Fritzsching's interview, his *Miranda* waiver was made voluntarily, knowingly and intelligently, and suppression of his statement is not warranted.

## II.  No government action violated Mr. Fritzsching's Due Process rights.

In the alternative, Mr. Fritzsching argues that "the destruction of the recording of the interview, or officer action rendering it otherwise unavailable to the defense, constitutes a violation of [Mr. Fritzsching's] right to Due Process," and the appropriate  remedy is suppression of the statements or dismissal.[149] This argument is rejected because the interview recording was not destroyed—it never existed. In addition, Mr. Fritzsching has failed to satisfy both the *Trombetta* and *Youngblood* standards.

### A.  No evidence was destroyed.

As a threshold matter, the *Trombetta* and *Youngblood* standards do not actually apply at all, because the recording allegedly destroyed or made unavailable never existed in the first place. The relevant Due Process cases[150] address evidence that the government initially possessed and then destroyed or lost, but do not address evidence that never existed at all. For example, in *Trombetta* several drivers, charged with driving under the influence, argued that not preserving Intoxilyzer breath samples violated their Due Process rights, because they could not attack the evidence during trial.[151]  Similarly, *Youngblood* involved a forensic technician's failure to properly refrigerate semen samples from a sexual assault investigation, which ultimately rendered the samples not useable.[152]

---

[149] Motion at 3.

[150] *See, e.g., Arizona v. Youngblood*, 488 U.S. 51 (1988); *California v. Trombetta*, 467 U.S. 479 (1984); *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994).

[151] *Trombetta*, 467 U.S. at 482-83.

[152] *Youngblood*, 488 U.S. at 58.

On the other hand, here, the evidence in question was not destroyed, contaminated, lost, misplaced, or negligently spoiled. Rather, the uncontradicted testimony at the evidentiary hearing showed that, through an innocent technical malfunction, the recording was never made.[153] Neither the prosecution nor the defense had access to the recording at any time. This is an important factual difference from *Trombetta* and *Youngblood*, because the agents were not constitutionally required to record the interview.[154] Ultimately, the incentive to record interviews comes from the evidentiary weight a recorded interview would provide, and the sanction for failing to do so is the risk of not obtaining convictions if the evidence ultimately fails to establish guilt beyond a reasonable doubt. Consequently, an innocent failure to record at all, which impacts both the prosecution and the defense, does not constitute a Due Process violation.

### B.  Mr. Fritzsching has not shown a Due Process violation under the *Trombetta* standard.

Assuming, in the alternative, that innocently failing to record an interview could be considered destruction or withholding of evidence, Mr. Fritzsching has still failed to satisfy the relevant legal standards. The Supreme Court has established two distinct standards to analyze destruction of evidence issues; the standard used depends on the value of the allegedly-destroyed evidence.[155] The first standard, which applies when the evidence has "exculpatory significance," comes from *California v. Trombetta*:[156]

Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent

---

[153] Tr. at 61-70.

[154] *Youngblood*, 488 U.S. at 58–59 (There is no Due Process Clause violation "when the police fail to use a particular investigatory tool.").

[155] *Bohl*, 25 F.3d at 910 ("We must first determine whether *Trombetta* or *Youngblood* governs our analysis of [defendants'] due process challenge. This inquiry turns on the import of the destroyed materials.").

[156] 467 U.S. 479 (1984).

before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means."[157]

The testimony at the evidentiary hearing does not satisfy the *Trombetta* standard because the recording's exculpatory significance was not "apparent." Two federal agents testified under oath that Mr. Fritzsching admitted to using the email address to receive child pornography.[158] Assuming that Mr. Fritzsching had stated, as his counsel proffered,[159] that he hadn't actually viewed the images, the preponderance of the evidence suggests that if the recording had been made, it would contain both inculpatory and exculpatory statements. Mr. Fritzsching has not shown that the exculpatory value was "apparent." Because Mr. Fritzsching has failed to satisfy the first prong of the *Trombetta* standard, there is no Due Process violation.

If Mr. Fritzsching had satisfied the first prong, he would still fail to satisfy the second prong of *Trombetta*, because he offered no evidence to show that he is unable to "obtain comparable evidence by other reasonably available means."[160] Because the recording is not available to either party, Mr. Fritzsching and the prosecution have the same opportunities for comparable evidence through the testimony of those who participated in the interview. Mr. Fritzsching has thus failed both prongs of the *Trombetta* standard, and there is no Due Process violation.

### C.  Mr. Fritzsching has not shown a Due Process violation under the *Youngblood* standard.

The second standard, which applies when the defendant can show only that the evidence destroyed or lost was "potentially useful," comes from *Arizona v. Youngblood*:[161]

---

[157] *Bohl*, 25 F.3d at 909–10 (citing *Trombetta*, 467 U.S. at 489).

[158] Tr. at 16.

[159]  Tr. at 98–99.

[160] *Bohl*, 25 F.3d at 909–10 (citing *Trombetta*, 467 U.S. at 489).

[161] 488 U.S. 51 (1988).

> [I]f the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence.[162]

Mr. Fritzsching has also failed to show a Due Process violation under the *Youngblood* standard, and therefore suppression is unwarranted. For the purposes of this motion, even assuming that the recording is "potentially useful," Mr. Fritzsching has not "show[n] that the government acted in bad faith[.]"[163] Agent Connor's uncontradicted testimony confirms that the recording failed due to an innocent mistake or technical difficulty.[164] In *Youngblood*, where the evidence at issue (semen recovered from a sexual assault case) was genetically unique and could not be substituted with other evidence, the Court held that there was no due process violation because the defendant had not shown that the officers acted in bad faith.[165] Similarly, Mr. Fritzsching has not shown that the agents acted in bad faith here. To the contrary, the evidence produced at the hearing showed that the recording was never made because of innocent mistake or technical difficulty.[166]

Therefore, based on the testimony produced at the evidentiary hearing, Mr. Fritzsching has not satisfied the *Youngblood* or *Trombetta* standards to establish a due process violation. Furthermore, the recorded interview was not destroyed, but was never made due to a technical equipment malfunction. For these reasons, neither suppression nor dismissal is appropriate.

---

[162] *Bohl*, 25 F.3d at 910 (citing *Youngblood*, 488 U.S. at 58).

[163] *Id.*

[164] Tr. 63–65.

[165] *Youngblood*, 488 U.S. at 58.

[166] Tr. at 10, 18–19, 39–40, 42–44, 46–47, 62–67, 69–70.

**ORDER**

IT IS HEREBY BY ORDERED that the Motion to Suppress[167] is DENIED because Mr.

Fritzsching's *Miranda* waiver was made knowingly and voluntarily, and there was no Due

Process violation in the innocent failure to record the interview that Agent Ross conducted with

Mr. Fritzsching.

Dated January 26, 2017.

BY THE COURT:

_____
David Nuffer
United States District Judge

---

[167] Docket no. 29.